RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0100p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

JASON BRICKER,

*Defendant-Appellee.*

Nos. 24-3286

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ELLIS MCHENRY (24-3289); LOIS JOCHINTO ORTA (24-5182),

*Defendants-Appellants.*

Nos. 24-3289/5182

Appeals from the
United States District Court for the Northern District of Ohio at Cleveland;
No. 1:05-cr-00113 (Bricker)—Dan A. Polster, District Judge;
No. 1:93-cr-00084 (McHenry)—Donald C. Nugent, District Judge,
and
United States District Court for the Eastern District of Kentucky at Covington;
No. 2:97-cr-00071 (Orta)—Danny C. Reeves, District Judge.

Argued:  October 31, 2024

Decided and Filed:  April 22, 2025

Before:  BATCHELDER, STRANCH, and READLER, Circuit Judges.

———————————————

**COUNSEL**

**ARGUED:** Andrew C. Noll, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for the United States. David A. O'Neil, DEBEVOISE & PLIMPTON LLP, Washington, D.C., for Jason Bricker. Christian J. Grostic, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Ellis McHenry. Alex P. Treiger, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C., for Lois Orta. **ON BRIEF:** Andrew C. Noll, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for the United States. David A. O'Neil, Suzanne Zakaria, DEBEVOISE & PLIMPTON LLP, Washington, D.C., Sandy Tomasik, James Stramm, Raphael M. Vim, DEBEVOISE & PLIMPTON LLP, New York, New York, for Jason Bricker. Christian J. Grostic, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Ellis McHenry. Alex P. Treiger, Justin B. Berg, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C., for Lois Orta. James Ewing, Vanessa V. Healy, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, Elaine K. Leonhard, UNITED STATES ATTORNEY'S OFFICE, Ft. Mitchell, Kentucky, for the United States.

BATCHELDER, J., delivered the opinion of the court in which READLER, J., concurred. STRANCH, J. (pp. 30–46), delivered a separate dissenting opinion.

———————————————

**OPINION**

———————————————

ALICE M. BATCHELDER, Circuit Judge. In this consolidated appeal, we REVERSE the judgment of the district court in *Bricker* and AFFIRM the judgments in *McHenry* and *Orta*.

This appeal concerns three federal prisoners serving lengthy sentences. Invoking the compassionate-release statute, 18 U.S.C. § 3582(c)(1)(A), which allows a court to reduce a final prison sentence for "extraordinary and compelling reasons," each prisoner sought release based on a recently enacted "policy statement," U.S.S.G. § 1B1.13(b)(6). In that statement, the Sentencing Commission announced that a nonretroactive change in the law can present an "extraordinary and compelling" reason warranting a sentence reduction if (1) a prisoner has served at least 10 years (2) of "an unusually long sentence," (3) there is a "gross disparity" between the actual sentence being served and a hypothetical sentence that would apply under the current law if any nonretroactive changes in the law since the original sentencing were given

retroactive effect, and (4) the sentencing court has fully considered "the defendant's individualized circumstances."[1]

To cut to the heart of this, because some recent revisions to federal sentencing law are not retroactive, old inmates are serving prison sentences that are much longer than the sentences of new inmates who committed the exact same crimes. Recognizing the unfairness, the Commission decided that the disparity was a good reason to grant these old-timers early release, or was at least a factor worth considering when deciding whether an individual old-timer had an "extraordinary and compelling reason" for early release. That is understandable and even laudable. The question is whether the Commission has the authority to do that under the law, particularly the Constitution.

To be specific, the questions in this appeal concern the separation of powers, specifically the Commission's power to overrule a Circuit Court's interpretation of a statute or to promulgate a policy statement that contradicts other federal statutes. The Sentencing Commission "is a peculiar institution"—a judicial-branch agency with "quasi-legislative" power—about which the Supreme Court has acknowledged that its "unique composition and responsibilities . . . give rise to serious concerns about a disruption of the appropriate balance of governmental power among the coordinate Branches." *Mistretta v. United States*, 488 U.S. 361, 383-85 (1989).

Based on the analysis that follows, we conclude that the Commission overstepped its authority and issued a policy statement that is plainly unreasonable under the statute and in conflict with the separation of powers. We therefore hold that U.S.S.G. § 1B1.13(b)(6) is invalid.

---

[1]The policy statement did not define "unusually long sentence" or "gross disparity." *See United States v. Crandall*, No. 89-CR-21, 2024 WL 945328, at *9 (N.D. Iowa Mar. 5, 2024) (asserting that these two phrases "lack any form of definition and invite arbitrary application," making the policy statement "unworkably vague"); *accord United States v. Vest*, 754 F. Supp. 3d 829, 837 (W.D. Mo. 2024) (analyzing and applying *Crandall*).

## I.

In 2005, Jason Bricker committed an armed bank robbery.  He pleaded guilty to all charges, including brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c), which carries an additional mandatory 84-month consecutive sentence.  The district court sentenced Bricker to the low end of the advisory guidelines range, 210 months, plus the additional statutory mandatory minimum, 84 months, for a total sentence of 294 months.  In December 2023, having served 216 months (18 years), Bricker moved for compassionate release pursuant to U.S.S.G. § 1B1.13(b)(6).  The district court agreed.  *United States v. Bricker*, No. 1:05 CR 113, 2024 WL 934858 (N.D. Ohio Mar. 5, 2024) (Polster, J.).  The court found that, pursuant to subsequent, nonretroactive changes in sentencing law, if Bricker were sentenced today, his advisory range would be 70 to 87 months, which the court found to be a sufficient disparity to justify a sentence reduction.[2]  The court acknowledged that the Sixth Circuit had already held that a nonretroactive change in the law is not an "extraordinary and compelling reason" for a sentence reduction, *United States v. McCall*, 56 F.4th 1048 (6th Cir. 2022) (en banc), but asserted that the Sentencing Commission had overruled *McCall*.  The court granted the motion, reduced Bricker's sentence to time served, and ordered him released.  *Id.* at *3.  The government appealed.[3]

In 1993, Ellis McHenry committed three armed carjackings.  Following a jury conviction, the district court sentenced him to the low end of the advisory guidelines range, 63 months, plus an additional 540 months due to the statutory mandatory minimum for the three § 924(c) counts, for a total sentence of 603 months.  Pursuant to subsequent, nonretroactive changes in federal sentencing law, if McHenry were sentenced today, the statutory mandatory additional sentence

---

[2]On appeal, the government contends that the district court made two additional mistakes that constitute plain error.  First, in calculating Bricker's new, hypothetical sentence, the court omitted the mandatory 84-month consecutive sentence for brandishing a firearm during a crime of violence, per § 924(c), without explanation but presumably by finding (erroneously) that it no longer applied.  Second, the court without objection from the government determined that Bricker would no longer be a career offender pursuant to changes to U.S.S.G. § 4B1.1, even though those changes were not made retroactive and § 1B1.13(b)(6) expressly excludes from consideration nonretroactive changes *to the Guidelines provisions*.  *See* fn. 9, *infra*.  But a full plain-error analysis as to whether the district court erred in either respect is unnecessary here, given our conclusion that § 1B1.13(b)(6) is invalid.

[3]A Sixth Circuit motions panel granted Bricker release pending appeal.

for the § 924(c) counts would be just 252 months, making his hypothetical current advisory range 315 to 330 months (63 to 78 months for the carjackings plus 252 months of statutory mandatory consecutive sentence for the § 924(c) counts). This is a disparity of at least 273 months (23 years) less than his actual sentence. In January 2024, having served some 354 months (almost 30 years),[4] McHenry moved for compassionate release based on U.S.S.G. § 1B1.13(b)(6). The district court denied the motion. *United States v. McHenry*, No. 1:93 CR 84, 2024 WL 1363448, at *5 (N.D. Ohio Mar. 29, 2024) (Nugent, J.) ("Applying § 1B1.13(b)(6) to grant the relief requested, would require [this court] to either disregard the mandatory minimum entirely, or to retroactively apply a penalty structure that Congress determined should not be retroactive. It would also mean disregarding the holding in *McCall*, a Sixth Circuit opinion that is binding on this [c]ourt.").

In 1998, a jury convicted Lois Orta on charges relating to distribution of over 50 pounds of methamphetamine and the district court sentenced him to a statutory mandatory minimum sentence of life in prison based on his prior convictions for felony drug offenses. Pursuant to subsequent, nonretroactive changes in federal sentencing law, if Orta were sentenced today, his statutory mandatory minimum would be 10 years (120 months) rather than life. In January 2024, having served almost 27 years (324 months)[5] of his sentence, Orta moved for compassionate release pursuant to U.S.S.G. § 1B1.13(b)(6).[6] The district court denied the motion, relying on *McCall* for the proposition "that binding Sixth Circuit precedent precludes a finding of an 'extraordinary and compelling' reason to justify a sentence reduction based on Section 401(a)'s non-retroactive changes to mandatory minimum sentences." *United States v. Orta*, No. 2:97 CR 00071, R. 699, PgID 906-07 (E.D. Ky., Feb. 16, 2024) (Reeves, J.). Orta appealed.

---

[4]Note that McHenry has not completed the 540 months required by the statutory mandatory minimum under which he was originally sentenced.

[5]Note that Orta has not completed the statutory minimum portion of his original sentence, which was life.

[6]This was Orta's third motion for compassionate release pursuant to § 3582(c)(1)(A)(i), and the latest in a long list of motions. After Orta's conviction and sentence were affirmed on direct appeal in 2001, he filed a 28 U.S.C. § 2255 motion, which the district court denied, and we affirmed the denial. In 2005, 2013, and 2016, Orta sought leave to file second or successive § 2255 motions, and we denied each request. In 2014 and 2019, Orta moved for sentence reductions pursuant to § 3582(c)(2); in 2019, Orta filed a "petition for writ of audita querela"; and in 2020, Orta filed a "motion for judicial inquiry." The district court denied each motion and we affirmed those he appealed.

We consolidated these three appeals for oral argument and this decision.

**II.**

Under the doctrines of nonretroactivity and finality, "in federal sentencing the ordinary practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced." *Dorsey v. United States*, 567 U.S. 260, 280 (2012); *see also Edwards v. Vannoy*, 593 U.S. 255, 258 (2021) ("a new rule of criminal procedure ordinarily does not apply retroactively" to cases that are not pending in trial courts or on direct review).

"The non-retroactivity doctrine is an ordinary rule applied to all criminal defendants." *United States v. Hunter*, 12 F.4th 555, 563 (6th Cir. 2021); 1 U.S.C. § 109. Likewise, the finality doctrine is ordinary and universal. "No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing that a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation." *Mackey v. United States*, 401 U.S. 667, 691 (1971) (Harlan, J., concurring).

"[A] judgment of conviction that includes [] a sentence [of imprisonment] constitutes a final judgment," 18 U.S.C. § 3582(b), and but for certain exceptions a "court may not modify a term of imprisonment once it has been imposed," § 3582(c); *Dillon v. United States*, 560 U.S. 817, 824 (2010) ("A judgment of conviction that includes a sentence of imprisonment constitutes a final judgment and may not be modified by a district court except in limited circumstances." (quotation and editorial marks omitted)); *see also United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009) ("Simply put, there is no inherent authority for a district court to modify an otherwise valid sentence."); *Mitchell v. United States*, 43 F.4th 608, 612 (6th Cir. 2022).

One exception is for "compassionate release," under which a district court may reduce a prisoner's otherwise-final sentence if it determines that (1) "extraordinary and compelling reasons" warrant a reduction, (2) a reduction is "consistent with applicable policy statements issued by the Sentencing Commission," and (3) the § 3553(a) factors, to the extent

applicable, support a reduction. § 3582(c)(1)(A)(i); *see also McCall*, 56 F.4th at 1054.[7] The underlying question in this appeal concerns the meaning of "extraordinary and compelling." Congress did not define what it meant by "extraordinary and compelling," instead assigning to the Sentencing Commission the task of describing what could be considered extraordinary and compelling reasons for sentence reduction. *See* 28 U.S.C. § 994(t). In a 2007 policy statement, the Commission gave "specific examples" of "what should be considered extraordinary and compelling reasons" for relief, U.S.S.G. § 1B1.13 cmt. n.1(A)-(D) (2007), namely health, age, family circumstances, and "other." But this policy statement applied only to those compassionate-release motions filed by the Bureau of Prisons, not those filed by prisoners. *United States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021).[8] For prisoner-filed compassionate-release motions, "we said that until Congress or the Commission acts, district courts have discretion to define 'extraordinary and compelling' on their own initiative." *Hunter*, 12 F.4th at 561-62 (quotation marks and citations omitted); *see also United States v. Jones*, 980 F.3d 1098, 1111 (6th Cir. 2020) (holding that district courts have "full discretion" relative to that of the Commission to "define 'extraordinary and compelling'").

In the meantime, many prisoners whose sentences would be much shorter if nonretroactive changes in the law were available retroactively began filing compassionate-release motions, claiming that the difference between the actual and would-be sentences was an

---

[7]The complete language of the compassionate-release statute is:

> **Modification of an imposed term of imprisonment.** –The court may not modify a term of imprisonment once it has been imposed except that in any case the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i) (paragraph breaks and dashes omitted).

[8]As enacted in 1987, only the Bureau of Prisons could file § 3582(c)(1)(A)(i) compassionate-release motions. But in December 2018, via the First Step Act, Congress authorized prisoners to file their own compassionate-release motions. *See Elias*, 984 F.3d at 518-19.

"extraordinary and compelling reason" for release, or at least a consideration. This led to conflicting panel opinions, and then to en banc consideration, in which the full Sixth Circuit concluded: "Nonretroactive legal developments do not factor into the extraordinary and compelling analysis. Full stop." *United States v. McCall*, 56 F.4th 1048, 1066 (6th Cir. 2022) (en banc). In reaching this conclusion, *McCall* held: (1) the phrase "extraordinary and compelling" in § 3582(c)(1)(A)(i) is unambiguous, *id.* at 1064; (2) "there is nothing extraordinary about the ordinary operation of our legal system, which assumes new statutes and caselaw have no retroactive effect," *id.* at 1063; and (3) "[n]onretroactive legal developments, considered alone or together with other factors, cannot amount to an 'extraordinary and compelling reason,'" *id.* at 1065-66.

*McCall* also included a footnote in anticipation of the Sentencing Commission's issuing a new policy statement about "extraordinary and compelling":

> Congress has delegated to the [Sentencing] Commission the task of describing what should be considered extraordinary and compelling reasons. 28 U.S.C. § 994(t). Whether the Commission could issue a new policy statement that describes 'extraordinary and compelling reasons' in a way that is inconsistent with our interpretation of the statute's language is a question that we need not resolve in the absence of an applicable statement. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005); *cf. United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 487-90 (2012) (plurality opinion).

*Id.* at 1054 n.3 (quotation and editorial marks omitted; certain citations omitted). So, *McCall* essentially envisioned the Sentencing Commission's promulgating a policy statement with a conflicting interpretation of § 3582(c)(1)(A)(i) (i.e., a different description of "extraordinarily and compelling"), but refused to address the effect of such a policy statement—that is, refused to advise whether an unknown Commission policy statement would affect its holding.

Within months the Sentencing Commission promulgated a policy statement positing that a nonretroactive change in the law *can be* an "extraordinary and compelling" reason for release when (1) a prisoner has served at least 10 years (2) of "an unusually long sentence," (3) there is a "gross disparity" between the actual sentence being served and a hypothetical sentence

calculated using the current law, and (4) the court has given full consideration to the defendant's individualized circumstances.[9]  U.S.S.G. § 1B1.13(b)(6) (eff. Nov. 1, 2023).[10]

This new version of § 1B1.13(b)(6) led to the motions the prisoners filed in this appeal. In *Bricker*, Judge Polster held that the Sentencing Commission overruled *McCall*.  In *McHenry*, Judge Nugent held that the Sentencing Commission could not overrule *McCall*, nor could it overrule a statute enacted by Congress without violating the separation of powers.  And in *Orta*, Judge Reeves refused, based on *McCall*, to apply nonretroactive changes in the law retroactively.

---

[9]The pertinent provisions of the new policy statement actually say:

(b) Extraordinary and Compelling Reasons – Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

. . .

(6) Unusually Long Sentence – If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

(c) Limitation on Changes in Law – Except as provided in subsection (b)(6), a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement. However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under this policy statement, a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction.

U.S.S.G § 1B1.13 (eff. Nov. 1, 2023).

[10]The Commission submitted this policy statement to Congress, which did nothing to modify or disapprove it, and the statement took effect on November 1, 2023.  But "policy statements," 28 U.S.C. § 994(a)(2), are different from "Guidelines," § 994(a)(1).  *See Stinson v. United States*, 508 U.S. 36, 41 (1993) ("The [Guidelines] Manual contains text of three varieties.  First is a guideline provision itself. . . . The second variety of text in the Manual is a policy statement.").  Before any Guideline amendment goes into effect, the Commission must provide it to Congress, which may modify or disapprove it by legislative act.  28 U.S.C. § 994(p); *see also Stinson*, 508 U.S. at 41.  Absent such an act, the amendment takes effect 180 days after it was submitted or no later than November 1 of that year.  *Id.*  But this Congressional-review provision for the Guidelines does not apply to policy statements.  *See United States v. Riccardi*, 989 F.3d 476, 484 (6th Cir. 2021) (only the Guidelines go through notice-and-comment rulemaking); *see also Stinson*, 508 U.S. at 41.  Unlike Guidelines, "[a]mendments to policy statements and commentary may be promulgated and put into effect at any time."  U.S.S.C. Rule of Practice and Procedure 4.1; *see also Matter of: U.S. Sent'g Comm'n*, B-335515 (Comp. Gen.), 2024 WL 1928504 (May 1, 2024).  Therefore, while the Commission may (and often does) submit policy statements to Congress, neither statute nor rule requires it to do so.  *See United States v. Moses*, 23 F.4th 347, 353 (4th Cir. 2022); *United States v. Johnson*, 964 F.2d 124, 127 (2d Cir. 1992).

These are legal and constitutional questions, so our review is de novo. *United States v. Curry*, 606 F.3d 323, 327 (6th Cir. 2010) ("If . . . the district court . . . concludes that it lacks the authority to reduce a defendant's sentence under the statute, the district court's determination that the defendant is ineligible for a sentence reduction is a question of law that is reviewed de novo."); *United States v. Henry*, 983 F.3d 214, 218 (6th Cir. 2020); *Hadix v. Johnson*, 133 F.3d 940, 942 (6th Cir. 1998); *United States v. Huguely*, 569 F. App'x 360, 360 (6th Cir. 2014).

**III.**

According to the government, when a Circuit Court has already held that a statute is unambiguous and construed it, the Sentencing Commission (agency) cannot overrule that holding by issuing a "policy statement" that re-interprets that statute to do the opposite. This is correct.

Stated simply, the issue is whether the Sentencing Commission can overrule the Sixth Circuit in this scenario. To be sure, Congress charged the Sentencing Commission with promulgating general policy statements that "describe" what can be considered "extraordinary and compelling reasons for sentence reduction" within the meaning of § 3582(c)(1)(A). 28 U.S.C. § 994(t). But once a court has interpreted the bounds of the Commission's delegated authority as we did in *McCall*, the Commission does not have the authority to overrule that interpretation.

In *Neal v. United States*, 516 U.S. 284, 286–87 (1996), a district court sentenced Meirl Neal to 192 months in prison, which included a 120-month statutory mandatory minimum due to his distributing over 10 grams of a "mixture or substance containing a detectable amount of" LSD (specifically, 11,456 doses of LSD comprising 109.51 grams) including the weight of the blotter paper. The pertinent statute did not define the terms "mixture" nor "substance," but the Supreme Court, in *Chapman v. United States*, 500 U.S. 453, 461–62 (1991), understood the "ordinary meaning" of those terms to require "the blotter paper [to] be weighed in determining whether [the LSD amount] crossed the 10-gram threshold." *See Neal*, 516 U.S. at 287. Two years after *Chapman* and five years after Neal's sentencing, the Sentencing Commission revised the Guideline for measuring LSD. Under the new Guideline (made expressly retroactive), the

Commission instructed courts *not* to weigh the entire substance containing LSD (e.g., the blotter paper), but to give each dose of LSD a constructive weight of 0.4 milligrams.[11]  *Id.*  Using this approach, the LSD attributable to Neal was 4.58 grams (11,456 doses x 0.4 milligrams), which did not trigger the statutory mandatory minimum (based on 10 grams), and led to a Guidelines range 70 to 87 months, a disparity of 105 to 122 months.  *Id.*  Neal moved for a sentence reduction based on the new (retroactive) Guideline, and his case made it to the Supreme Court. *Id.* at 288-89.

Before the Supreme Court, Neal argued that the Commission could—and did—overrule the Court, so "the method approved in *Chapman* is no longer appropriate."  *Id.* at 289.  The Court explained his theory:

> [Neal] argues . . . that the Commission is the agency charged with interpretation of penalty statutes and expert in sentencing matters, so its construction of [the statute] should be given deference.  Congress intended the Commission's rulemaking to respond to judicial decisions in developing a coherent sentencing regime, so, [Neal] contends, deference is appropriate even though the Commission's interpretation postdated *Chapman*.

*Id*. at 290 (citations omitted).  After some discussion of the language of the revised Guideline and a frank recognition that the Commission "has no authority to override the statute," *id*. at 294, the Court rejected Neal's argument about the Commission's authority over the Court:

> [Even assuming] the Commission's view that the dose-based method is consistent with the term 'mixture or substance' in the statute, [Neal] still would not prevail. The Commission's dose-based method cannot be squared with *Chapman*.  The Guideline does take into account some of the weight of the carrier medium . . . , but we held in *Chapman* that [the statute] requires the entire mixture or substance to be weighed when calculating the sentence.  In these circumstances, we need not decide what, if any, deference is owed the Commission in order to reject its alleged contrary interpretation.  Once we have determined a statute's meaning, we adhere to our ruling under the doctrine of *stare decisis*, and we assess an agency's later interpretation of the statute against that settled law.

---

[11]"The Commission submitted the amendment to Congress, which did not disapprove it in the 180 days allotted by statute.  *See* 28 U.S.C. § 994(p).  The amended Guideline took effect on November 1, 1993, and was in force when [Neal] was resentenced."  *Neal*, 516 U.S. at 293.

*Id.* at 294-95 (quotation marks, editorial marks, and citations omitted). *See also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 984 (2005) ("Thus, *Neal* established only that a precedent holding a statute to be unambiguous forecloses a contrary agency construction."); *United States v. Koons*, 850 F.3d 973, 979 (8th Cir. 2017), *aff'd*, 584 U.S. 700 (2018) ("Nor can the Sentencing Commission overrule circuit precedent interpreting a *statutory* provision." (quotation marks, editorial marks, and citation omitted; emphasis in original)). Therefore, once a court has determined a statute's clear and unambiguous meaning, the Commission cannot overrule that interpretation. *See United States v. Austin*, 125 F.4th 688, 692 (5th Cir. 2025) ("[T]he Sentencing Commission cannot make retroactive what Congress made non-retroactive. And it certainly cannot do so through an interpretation of 'extraordinary and compelling' that conflicts with the plain meaning of those terms. Moreover, the Commission does not have the authority to amend the statute we construed in [prior cases]." (quotation marks and citations omitted)) (citing *Neal*, 516 U.S. at 290, and *Koons*, 850 F.3d at 979).

In *McCall*, 56 F.4th at 1065-66, the en banc court held that the phrase "extraordinary and compelling" in § 3582(c)(1)(A)(i) is clear and unambiguous and concluded that "[n]onretroactive legal developments, considered alone or together with other factors, cannot amount to an 'extraordinary and compelling reason'" for sentence reduction.[12] *McCall* did so by looking at

---

[12]The prisoners argue that *McCall* does not apply in this case at all—that it has been abrogated and is void—by contending that "the *McCall* Court recognized that its power to interpret the phrase 'extraordinary and compelling' was limited and that at the time of its decision it lacked the binding guidance Congress directed the Commission to provide." Bricker Appellee Br. at 25 n.5; *see also United States v. Brown*, No. 2:95-cr-66, 2024 WL 409062, at *4 (S.D. Ohio Feb. 2, 2024) (saying "the Sixth Circuit decided *McCall* in the absence of an applicable policy statement, and explicitly left open the possibility that a provision such as § 1B1.13(b)(6) could abrogate its holding"). Even if this characterization of *McCall* were correct—though it clearly is not—it adds nothing to the analysis here, it merely assumes the policy statement was binding on *McCall* and therefore *McCall* was powerless to contradict it.

*McCall* actually said: "Whether the Commission could issue a new policy statement that describes 'extraordinary and compelling reasons' in a way that is inconsistent with our interpretation of the statute's language is a question that we need not resolve in the absence of an applicable statement." *McCall*, 54 F.4th at 1054 n.3. That is, *McCall* merely declined to opine about the validity of a hypothetical policy statement. In no way did *McCall* suggest that it lacked the power to decide the appeal or that the Commission could abrogate its holding.

Put another way, the *McCall* footnote does nothing to deprive the opinion of its precedential weight on the substantive matter about which we did opine (i.e., whether § 3582(c)(1)(A) plainly foreclosed an understanding of "nonretroactive changes in sentencing law" as counting as "extraordinary and compelling"). *See* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989) ("[W]hen the Supreme Court of the federal system, or of one of the state systems, decides a case, not merely the *outcome* of that decision, but the *mode*

the plain meaning of "extraordinary and compelling" against the backdrop of the "background principles" of finality and nonretroactivity and the "structure of federal sentencing law, and "confirm[ed]" that reading by considering the history and practice of compassionate release. *Id.* at 1055–60. True, *McCall* did look beyond the words "extraordinary and compelling" to reach its conclusion, but that was in keeping with basic principles of statutory interpretation to not look at text in isolation to discern its unambiguous meaning. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371 (1988) (recognizing that statutory construction is a "holistic endeavor"). In the end, *McCall* did not mince words in holding that there was "no . . . ambiguity" with § 3582(c)(1)(A), stating that: "The text of the compassionate release statute, informed by the principles, history, and structure of sentencing law forecloses McCall's argument." *McCall*, 56 F.4th at 1064. Indeed, *McCall* used the phrase "full stop," after concluding that "[n]onretroactive legal developments do not factor into the extraordinary and compelling analysis," *id.* at 1066, raising the question of what else *McCall* could have possibly said to show that we—as an en banc court—were closing the door as to scope of what "extraordinary and compelling" means. *See* Cambridge English Dictionary, https://dictionary.cambridge.org (defining the phrase "full stop" to mean "you will not continue to discuss a subject").

Accordingly, under *Neal*, the Commission cannot overrule *McCall*'s determination about the plain text of the statute by promulgating a contradictory policy statement. This is the point of *McCall*'s footnote three, in which it addressed the possibility of a future Commission policy statement by citing principally to *Brand X*, 545 U.S. at 982 ("A court's prior judicial construction of a statute trumps an agency construction . . . if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."), and *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 487 (2012) ("The fact that a statute is unambiguous means that there is no gap for the agency to fill

---

*of analysis* that it applies will thereafter be followed by the lower courts within that system, and even by that supreme court itself."). Especially so because our case law had bestowed on district courts "full discretion to define 'extraordinary and compelling.'" *See Jones*, 980 F.3d 1098. So, *McCall* was decided in a world in which courts had the equivalent powers of interpretation as the Commission. The Commission has now stepped back into the shoes worn exclusively by the district courts, but that cannot—and does not—change either the analysis or the substantive outcome here.

and thus no room for agency discretion." (quotation marks omitted)).  Given *McCall*'s predicate holding that the statutory term "extraordinary and compelling" is unambiguous and its core holding that ordinary nonretroactive changes in the law cannot be "extraordinary," these precedents dictate that a conflicting interpretation from the Commission could not overrule the *McCall* holding.

The prisoners argue that the Commission *can and did* overrule *McCall*'s interpretation because three statutes make this policy statement binding on the courts: in 28 U.S.C. § 994(a)(2)(C), Congress empowered the Commission, by express delegation, to issue policy statements about "the appropriate use of . . . the sentence modification provisions set forth in . . . 3582(c)"; then in § 994(t), Congress specifically empowered the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction" in § 3582(c)(1)(A); and in § 3582(c)(1)(A), Congress required the courts to ensure "that [any] reduction is consistent with applicable policy statements issued by the Sentencing Commission." The prisoners rely on *Dillon v. United States*, 560 U.S. 817, 827 (2010) (saying "§ 3582(c)(2) requires the court to follow the Commission's instructions in § 1B1.10 to determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized"), to contend that this language demands that district courts must defer to and apply the Commission's policy statements.  And the prisoners rely on *Braxton v. United States*, 500 U.S. 344, 348 (1991) ("Congress necessarily contemplated that the Commission would periodically review the work of the courts, and would make whatever clarifying revisions to the Guidelines conflicting judicial decisions might suggest."), to contend that policy statements overrule prior judicial precedent.

But *Dillon* and *Braxton* are cases about the Commission's authority when it interprets or reinterprets its own Guidelines (regulations); neither is about the interpretation of a statute, and neither considers, much less reconciles, *Neal*.  These cases do not and cannot overcome *Neal* or establish that the Commission can overrule a court's interpretation of an unambiguous statute. *See Koons*, 850 F.3d at 979 ("[T]he Sentencing Commission [cannot] overrule circuit precedent interpreting a *statutory* provision"); *Austin*, 125 F.4th at 692; *see also United States v. Jean*, 108 F.4th 275, 296 (5th Cir. 2024) (Smith, J., dissenting) (similar).

The prisoners also rely on *Batterton v. Francis*, 432 U.S. 416 (1977), to argue that "express delegation" alone is enough to empower the Commission to overrule *McCall*'s interpretation of the statute. In *Batterton*, a case arising from the Social Security Act, the Court explained:

> [When] Congress . . . expressly delegate[s] to the [agency] the power to prescribe standards for determining what constitutes [a statutory term] . . . , Congress entrusts to the [agency], rather than to the courts, the primary responsibility for interpreting the statutory term. In exercising that responsibility, the [agency] adopts regulations with legislative effect. A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner. The regulation at issue in this case is therefore entitled to more than mere deference or weight. It can be set aside only if the [agency] exceeded [its] statutory authority or if the regulation is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

*Id*. at 425-26 (quotation marks, citations, footnotes, and paragraph break omitted). Of course, there was no prior judicial interpretation of the statute in *Batterton*, so *Batterton* did not have to consider or address an agency's power to overrule an existing judicial interpretation.

More to the point, even with an express delegation of authority, the Commission does not have limitless power to define "extraordinary and compelling" to mean what it plainly does not allow, which, as recognized in *McCall*, 56 F.4th at 1066, includes nonretroactive changes in law. *See* 28 U.S.C. §994(a) (stating that any Commission policy statements must be "consistent with all pertinent provisions of any Federal statute."); *United States v. LaBonte*, 520 U.S. 751, 757 (1997) (observing that the Commission's power is not limitless and it "must bow to the specific directives of Congress"); *United States v. Rutherford*, 120 F.4th 360, 375-76 (3d Cir. 2024) (similar). This understanding aligns with the general principles we follow in reviewing whether an agency rule comports with a statute. Until recently, when a court was confronted with an agency's construction of a statute that it administers, the court would conduct a *Chevron* analysis, in which it would first determine whether the statute is silent or ambiguous with respect to the specific issue being interpreted. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (footnote omitted), overruled by *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). If so, Congress had implicitly delegated authority to the agency, limiting the court's role to merely determining "whether the agency's answer is based on a permissible

construction of the statute." *Id.* As a corollary to that principle, *Chevron* recognized that if Congress had made "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," then "[s]uch legislative regulations [we]re given controlling weight unless they [we]re arbitrary, capricious, or manifestly contrary to the statute." *Id.* (footnote omitted).

But the Court has overruled *Chevron*'s core holding, explaining its flaws—as relevant here—to include:

> *Chevron* . . . demands that courts mechanically afford *binding* deference to agency interpretations, including those that have been inconsistent over time. Still worse, it forces courts to do so even when a pre-existing judicial precedent holds that the statute means something else—unless the prior court happened to also say that the statute is 'unambiguous.' That regime is the antithesis of the time honored approach the [Administrative Procedure Act] prescribes. In fretting over the prospect of allowing a judicial interpretation of a statute to override an agency's in a dispute before a court, *Chevron* turns the statutory scheme for judicial review of agency action upside down.

*Loper Bright*, 603 U.S. at 399 (quotation marks, editorial marks, and citations omitted); *see also Mazariegos-Rodas v. Garland*, 117 F.4th 860, 877 (6th Cir. 2024) ("The problem . . . is that *Brand X* . . . stated in no uncertain terms that the 'principle' of agencies effectively overruling federal courts of appeals follows from *Chevron* itself. And now that *Chevron* is overruled, the [agency] has no legal authority to disregard precedential decisions of this court." (quotation marks, editorial marks, and citations omitted)). So, after *Loper Bright*, courts no longer defer to agency regulations as the authoritative (binding) interpretation of a statute. *See*, *e.g.*, *Seldon v. Garland*, 120 F.4th 527, 531 (6th Cir. 2024) ("After *Loper Bright*, we may look to agency interpretations of the INA for guidance, but do not defer to the agency. . . . As to agency regulations, we must thoroughly evaluate an agency's interpretation of an ambiguous regulation before giving any deference." (quotation marks, editorial marks, and citations omitted)). Rather, "when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it. But courts need not and . . . may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright*, 603 U.S. at 413. And this principle extends to express delegations of authority, which are simply a difference in degree, not kind, from implicit delegations based on a

law's silence or ambiguity. *See Moctezuma-Reyes v. Garland*, 124 F.4th 416, 420 (6th Cir. 2024) (explaining our role under *Loper Bright* when "confronted" with a statute that expressly authorizes the "agency to interpret a broad standard"); *Pickens v. Hamilton-Ryker IT Sols., LLC*, -- F.4th --, No. 24-5407, 2025 WL 972526, at *9 (6th Cir. Apr. 1, 2025) (explaining that even when the statute expressly delegates authority to an agency, creating some degree of deference, we must still "ensure that the agency's action is both reasonable and reasonably explained" and "[t]hrough it all, we must decide for ourselves whether the law means what the agency says" (quotation marks omitted)) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and *Loper Bright*, 592 U.S. at 392). Our duty remains the same: to "independently interpret the statute and effectuate the will of Congress . . . by fixing the boundaries of the delegated authority," even if those boundaries continue to provide the agency with considerable discretion. *Loper Bright*, 603 U.S. at 371; *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 57 (2011) (recognizing a court's review "does not turn on whether Congress's delegation of authority was general or specific"); *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 158 (1991) (recognizing that "the same standard of substantive review" governs all exercises of delegated lawmaking power).

Therefore, *Loper Bright* negates the prisoners' argument that § 1B1.13(b)(6) overrules *McCall* because courts must defer to an agency's interpretation of what they view to be an ambiguous phrase, "extraordinary and compelling."[13] Not only are we bound by *McCall*'s views on the plain meaning of "extraordinary and compelling," *see United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017), but Courts no longer defer to agency interpretations—or a Commission policy statement—just because a statute is ambiguous. *See Loper Bright*, 603 U.S. at 400-01 ("Perhaps most fundamentally, . . . agencies have no special competence in resolving statutory

---

[13]This argument rests on the prisoners' claim that *McCall* must have found the phrase "extraordinary and compelling" to be ambiguous because it used the tools of statutory construction that are generally reserved for ambiguous language. But a plain reading of *McCall* rejects this claim. *McCall* conceded that the phrase in the abstract has a "broad range of meaningful application[s]," but it clearly and unambiguously does *not* include nonretroactive changes in sentencing law. *McCall*, 56 F.4th at 1058-59; *see also id.* at 1064 ("There is no such ambiguity here."); at 1055 ("[T]he text of the . . . statute gives way to a basic inference: What is 'ordinary' and routine cannot also be extraordinary and compelling."); at 1056 ("Viewed in this light, the phrase 'extraordinary and compelling reasons' comes into sharper focus."); at 1065 ("[W]e cannot reconcile this approach with the plain text of the . . . statute.").

ambiguities. Courts do."); *see Rutherford*, 120 F.4th at 379 (concluding that *Loper Bright* is "instructive" as "we assess the assertion that the Commission's view of a statute should trump our own"). Instead, we must "use every tool at [our] disposal to determine the best reading of the statute." *Loper Bright*, 603 U.S. at 400; *see also Kentucky v. USEPA*, 123 F.4th 447, 467 (6th Cir. 2024) ("[T]he EPA resolves a pure question of law when it interprets the key terms in § 7607(b)(1) (such as 'nationally applicable' or 'determination'). After *Loper Bright*, we must review (and correct) the agency's mistaken interpretation of those terms without giving it deference.").

A plain reading of the compassionate-release statute conflicts with the Commission's new policy statement. Policy statement § 1B1.13(b)(6) concludes that because a nonretroactive change in sentencing law does not apply to prisoners sentenced under the old law, the withheld benefit (i.e., the would-be lower sentence) can be an "extraordinary and compelling reason" for a sentence reduction. But rather than extraordinary, "the *ordinary* practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced." *Dorsey*, 567 U.S. at 280 (emphasis added). Similarly, there is nothing inherently compelling about the length of a lawful sentence. What is ordinary—the nonretroactivity of judicial precedent announcing a new rule of criminal procedure—is not extraordinary, and what is routine—a criminal defendant's serving the duration of a lawfully imposed, Guidelines-based sentence—is not compelling. *See Rutherford*, 120 F.4th at 370-71.

The prisoners also argue that the withheld benefit (i.e., the would-be lower sentence) of nonretroactivity is an "extraordinary and compelling reason" for a sentence reduction because Black's Law Dictionary defines extraordinary to include "out of the ordinary; exceeding the usual, average, or normal measure or degree"; defines "extraordinary circumstances" to include "extenuating circumstances"; and defines "extenuating circumstances" to include those that "render a . . . crime less . . . reprehensible than it would otherwise be," or that call for "reduce[d] . . . punishment." Thus, to the prisoners, "extraordinary" reasons include any reasons or circumstances "that tend to call for reduced punishment." Bricker Br. at 35; Orta Br. at 31. Given that the very purpose of § 3582(c)(1)(A)(i) is to reduce a prisoner's punishment, this boils down to a proposition that any conceivable reason will suffice and must be considered.

But § 3582(c)(1)(A)(i) does not say "*a* reason" or "*any* reason" or even "a *good* reason." It says that a court "may reduce the term of imprisonment . . . if it finds . . . *extraordinary and compelling* reasons warrant such a reduction." Nor does it say, "if it finds extenuating circumstances" or "if it finds reasons that tend to call for reduced punishment." It says "extraordinary." To be sure, extraordinary can certainly mean many things, but what it cannot mean is ordinary. It has to mean something more than ordinary. And "the ordinary practice" is to withhold changes in the law from prisoners already sentenced. *Dorsey*, 567 U.S. at 280. Therefore, withholding the benefit of nonretroactive changes cannot be extraordinary.

The prisoners argue that even if nonretroactivity alone is not extraordinary, the necessary inquiry into "extraordinary and compelling" reasons requires the court to consider a "confluence of numerous different factors, any one of which could in isolation be deemed 'ordinary,' but together are extraordinary and compelling." *See*, *e.g.*, Bricker Br. at 37. "For example," they say "it is ordinary to get old. And it is ordinary to get sick. But age or health can combine with other 'ordinary' factors (like serving a lawful sentence) to create a confluence of factors that . . . constitute 'extraordinary and compelling' circumstances." Bricker Br. at 37-38. One of the dissents in *McCall* pressed this same argument unsuccessfully. *See McCall*, 56 F.4th at 1070-71 (Moore, J., dissenting) (contending that the question is not "whether a change in law is itself extraordinary or compelling," but "whether there are 'extraordinary and compelling reasons' to reduce the sentence when a particular statutory change is considered in the context of the defendant's individualized circumstances" (quotation marks and citations omitted)).

The principal flaw in this argument is that it presupposes that nonretroactivity is a *permissible* factor. It is not. As explained, § 1B1.13(b)(6)'s construction of "extraordinary and compelling" (as giving retroactive effect to nonretroactive changes in the law) conflicts with other statutes (either the nonretroactive statutory amendments or 1 U.S.C. § 109), and the Commission cannot interpret a statute in a way that contradicts or negates other statutes. *See* 28 U.S.C. § 994(a) (the Commission must comply "with all pertinent provisions of any Federal statute").

The point to all of this is that even an express Congressional delegation of authority does not mean the Commission's policy statement necessarily trumps a prior judicial determination. Rather, "when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Loper Bright*, 603 U.S. at 413; *accord Pickens*, 2025 WL 972526, at *9 ("Through it all, we must decide for ourselves whether the law means what the agency says."). So, the determinative question is whether § 1B1.13(b)(6) comports with the plain language of § 3582(c)(1)(A)(i). Any other reading would raise serious separation-of-power concerns vis-à-vis the judiciary by forcing a judge to accept the Commission's interpretation of a law, "even if he thinks another interpretation is correct," and by transferring the "judiciary's interpretive judgment" to the Commission. *See Loper Bright*, 603 U.S. at 414-15 (Thomas, J., concurring) (quotation marks and citations omitted).

## IV.

The prisoners' assertion of the Commission's authority raises additional risks to the separation of powers beyond their effect on the judiciary. The prisoners would empower the Commission to exercise the legislative powers vested in Congress, and allow the Commission to override existing law. *See Loper Bright*, 603 U.S. at 415 (Thomas, J., concurring). The Sentencing Commission's "policy statement" re-interprets the statute to give retroactive effect to nonretroactive changes in sentencing law, contrary to 1 U.S.C. § 109, which bars retroactivity.

Put another way, the issue is whether the Commission can ignore other statutes. The Commission has "significant discretion" in formulating the Guidelines and policy statements, *Mistretta*, 488 U.S. at 377, but it must act consistently with the statute's plain language, *Neal*, 516 U.S. at 290 ("the Commission does not have the authority to amend [a] statute"). Moreover, the Commission cannot interpret a statute in such a way as to contradict or negate other statutes.

In *United States v. LaBonte*, 520 U.S. 751, 752 (1997), the Court considered 28 U.S.C. § 994(h), which directed the Commission to "assure" that its Guidelines specify a prison sentence "at or near the maximum term authorized for categories" of certain offenders who had committed repeated felony drug offenses or violent crimes. The Commission interpreted the

statutory phrase "maximum term authorized" to mean "the maximum term available without [applicable sentencing] enhancements," and the Court held that "interpretation [to be] inconsistent with § 994(h)'s plain language." *Id.* at 752-53. Most relevant here is the Court's analysis of the respondents' argument that, because some defendants would qualify for enhancements while others would not, an unambiguous reading of § 994(h) would "permit only the unenhanced maximum because th[at] is the highest possible sentence that could apply to *all* of the defendants." *Id.* at 759 (emphasis added). In rejecting this argument, the Court explained that a reading of § 994(h) that excluded valid enhancements for individual defendants "would largely eviscerate the penalty enhancements Congress enacted in [other] statutes such as § 841." *Id*. at 760.

> We are unwilling to read § 994(h) as essentially rendering meaningless entire provisions of other statutes to which it expressly refers. Under respondents' novel construction, a repeat drug or violent felon could only receive a sentence at or near the maximum allowed for defendants who had no such prior qualifying convictions or who had never received the notice under § 851(a)(1). Indeed, if this interpretation . . . were adopted, a sentencing court could be forbidden to impose the enhanced maximum penalty. Congress surely did not establish enhanced penalties for repeat offenders only to have the Commission render them a virtual nullity.

*Id.* So, the Commission cannot interpret a statute so as to contradict or negate other statutes. *See also* 28 U.S.C. § 994(a) (the Commission may act only "pursuant to its rules and regulations and *consistent with* all pertinent provisions of *any Federal statute*" (emphasis added)).

As explained above, § 1B1.13(b)(6) enables courts to measure a prisoner's actual sentence against a hypothetical sentence calculated by applying nonretroactive changes to sentencing law as if they were retroactive. If the disparity is large enough (i.e., "gross") then the court can reduce the prisoner's sentence, effectively giving retroactive effect to the nonretroactive change to sentencing law. This contradicts the nonretroactivity of the individual sentencing revisions and circumvents Congress's clear limitation on retroactively applying new legislation:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining

in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109.  That is, § 1B1.13(b)(6) would effectively negate § 109 by empowering a court to reduce a prisoner's sentence by giving retroactive effect to expressly nonretroactive changes.

The prisoners argue that other statutes do not—and cannot—limit § 1B1.13(b)(6) because Congress expressly delegated authority to the Commission to promulgate § 1B1.13(b)(6) to describe "extraordinary and compelling reasons" for relief under § 3582(c)(1)(A)(i), and in so doing placed one and only one limit on the Commission's authority, namely that: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).  The prisoners contend that Congress's decision to expressly exclude this one particular reason and no others means that the Commission's discretion is otherwise unlimited. *See United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others.  The proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth.").  More to the point, as relevant here, the prisoners' argument is that because Congress expressly excluded rehabilitation alone, and did not expressly exclude nonretroactive changes in the law, Congress intended that the Commission could make nonretroactive changes in the law an "extraordinary and compelling reason" for release.  This is questionable, to say the least—that Congress meant to authorize the Commission to abrogate 1 U.S.C. § 109 and the express nonretroactivity provisions of the individual sentencing amendments through this omission of an express limitation.  *See McCall*, 56 F.4th at 1056 (requiring a clear statement rule for when Congress wants a change in sentencing law to have a retroactive effect).  But, like this entire argument, this questionable aspect of it is beside the point.

Rehabilitation alone is *not* the only congressionally imposed limit; it is a specific limit within the principal limit that the reason must be "extraordinary and compelling."  *Cf. Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 218 (2024) ("[A] 'context dependent' term often draws its meaning from surrounding provisions.").  Congress did not grant the Commission limitless authority—§ 3582(c)(1)(A)(i) does not say "any reason identified by the Commission"; it says the reason must be "extraordinary and compelling."  *See McCall*, 56 F.4th at 1063.

So, the question is not whether Congress authorized the Commission to concoct any reason at all (other than rehabilitation alone)—it certainly did not. Congress limited the Commission to describing "extraordinary and compelling" reasons, and the question is whether the nonretroactive effect of a new law can ever be "extraordinary" when § 109 plainly announces that *non*-retroactivity is always ordinary. It is likely that Congress did not include an express prohibition on nonretroactivity in § 994(t) because § 109 already established that nonretroactivity was not extraordinary.

The key point, however, is that § 3582(c)(1)(A)(i) and § 994(t) did not empower the Commission to overrule or disregard other statutes. The Commission must interpret statutes in a way that complies or coexists with other statutes. *See LaBonte*, 520 U.S. at 760; *see also Koons*, 584 U.S. at 707 ("policy statements cannot make a defendant eligible [for re-sentencing] when [a statute] makes him ineligible"). And the determinative question is, again, whether U.S.S.G. § 1B1.13(b)(6) comports with 18 U.S.C. § 3582(c)(1)(A)(i) in light of these statutes. *See United States v. Black*, 131 F.4th 542, 546 (7th Cir. 2025) (holding that because "§ 1B1.13(b)(6) conflicts with another statute (here, the First Step Act), the Commission has exceeded the scope of its explicitly delegated authority, and § 1B1.13(b)(6) is invalid," while adding that "courts, not the Commission . . . determine whether such conflicts exist" (citing *Loper Bright*, 603 U.S. at 412)).

The prisoners argue that Congress clearly intended the analysis to account for a totality of the circumstances, meaning that nonretroactivity—like rehabilitation—would be considered among the combination of circumstances contributing to an individual prisoner's "extraordinary and compelling reason" for release. Recall that § 994(t) says that rehabilitation *alone* is not an extraordinary and compelling reason, leading to the reverse inference that rehabilitation can be considered in combination with other reasons. But again, this presupposes *permissible* reasons, not just any possible reason, such as a prisoner's having a peanut allergy or being related to the President. Combining permissible reasons is different from considering an impermissible reason. And that brings this back to whether nonretroactivity is a permissible reason, and whether § 1B1.13(b)(6) properly interprets § 3582(c)(1)(A)(i) to negate these other statutes.

**V.**

As demonstrated by its application in these cases, particularly *McHenry* and *Orta*, the intent or effect of § 1B1.13(b)(6), as superseding (or negating) other statutes, raises another question: can the Commission interpret § 3582(c)(1)(A)(i) to empower a court to reduce a sentence below the statutory mandatory minimum portion of the sentence? This appears to be a question that has seldom been asked, much less answered, but certainly lurks in the background here.

Start with the basics. Congress, and not the Commission, holds the "legislative responsibility for establishing minimum and maximum penalties for every crime." *Mistretta*, 488 U.S. at 396: *Apprendi v. New Jersey*, 530 U.S. 466, 466-67 (2000) ("While judges in this country have long exercised discretion in sentencing, such discretion is bound by the range of sentencing options prescribed by the legislature."); *see also Ohio v. Johnson*, 467 U.S. 493, 499 (1984) ("the substantive power to prescribe crimes and determine punishments is vested with the legislature"); *United States v. Reese*, 92 U.S. 214, 221 (1875) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."); *United States v. Wiltberger*, 18 U.S. 76, 95 (1820) ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment."); *cf. Fischer v. United States*, 603 U.S. 480, 497 (2024) ("We have long recognized that the power of punishment is vested in the legislative, not in the judicial department. . . . " (citation omitted)). So, "[w]here a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence." U.S.S.G. § 5G1.1(b); *Dorsey*, 567 U.S. at 266-67 ("[O]rdinarily no matter what range the Guidelines set forth, a sentencing judge must sentence an offender to at least the minimum prison term set forth in a statutory mandatory minimum.").

"When a statute sets out a mandatory minimum sentence, a defendant convicted under that statute will generally receive a sentence at or above the mandatory minimum—but not always." *Koons*, 584 U.S. at 702-03. That is, but for two specific statutory exceptions, a court may not set a sentence below the statutory minimum.

> When a defendant faces a statutory minimum sentence, the district court's ability to depart downward below that minimum is *limited to two provisions*—18 U.S.C. § 3553(e), which allows for departures based upon the government's motion indicating that a defendant has provided substantial assistance in the investigation of other suspects, and 18 U.S.C. § 3553(f), which is known as the 'safety valve' provision. . . . [W]e [have] recognized that all of the courts that have addressed the issue have determined that these two provisions represent *the exclusive means* by which a district court may depart below a statutory minimum.

*United States v. Stewart*, 306 F.3d 295, 331 n.21 (6th Cir. 2002) (citations omitted; emphasis added) (quoted with approval in *United States v. Battles*, 350 F. App'x 16, 19 (6th Cir. 2009); cited with approval in *United States v. McIntosh*, 484 F.3d 832, 835 (6th Cir. 2007) ("These are the exclusive means by which a court may depart below the statutory minimum.")).

Notice that both provisions use language that expressly and unequivocally empowers a court to go below the statutory minimum based on the specifically identified conditions:

> (e) *Limited authority to impose a sentence below a statutory minimum.* – Upon motion of the Government, the court shall have the authority to impose a sentence *below a level established by statute as a minimum sentence* so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

> (f) *Limitation on applicability of statutory minimums* in certain cases. – Notwithstanding any other provision of law, in the case of an offense under [certain statutes], the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 *without regard to any statutory minimum sentence*, if the court finds at sentencing, after the Government has been afforded the opportunity to make [certain] recommendation[s.]

18 U.S.C. § 3553 (emphasis added). There are two takeaways from this statute and the above case law: (1) Congress knows how to authorize the Commission to override another legislative directive and when it does, it does so expressly; and (2) Congress overrides an existing legislative directive *only* when it does so clearly and expressly. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("[I]n approaching a claimed conflict, we come armed with the strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute")

(quotation marks and citations omitted)); *Dean v. United States*, 581 U.S. 62, 70 (2017) ("[D]rawing meaning from silence is particularly inappropriate where Congress has shown that it knows how to direct sentencing practices in express terms." (quotation marks, editorial marks, and citation omitted)); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007) (recognizing that agency action must "comport[] with the canon against implied repeals" so as to not "effectively override" other statutory mandates).

In this light, § 3582(c)(1)(A)(i)—which says nothing at all about statutory mandatory minimums—could never empower a court to reduce a sentence below the statutory minimum portion of that sentence. For example, suppose that McHenry and Orta could show extraordinary and compelling circumstances warranting compassionate release—based on, say, old age, terminal illness, and dire family conditions. Even then, § 3582(c)(1)(A)(i) would not empower a court to reduce their sentences below 540 months and life, respectively, because § 3582(c)(1)(A)(i) does not clearly and expressly authorize the Commission or the courts to override the statutory minimum, certainly not in the clear and express way that § 3553(e) and (f) do.

Also consider *United States v. Goff*, 6 F.3d 363, 365 (6th Cir. 1993), in which the district court found that a wheelchair-bound quadriplegic defendant had "an extraordinary physical impairment," such that U.S.S.G. § 5H1.4 justified a 60-month sentence, well below the 120-month statutory mandatory minimum sentence. In reversing, we said, "the district court's attempt to fashion an equitable sentence for a disabled man [wa]s understandable, [but] it was without authority to do so," and we held that "[a] statutorily mandated minimum sentence cannot be reduced by a guidelines policy statement." *Id*. at 366 (citing *Stinson*, 508 U.S. at 38).

Now suppose that five years (60 months) later, Goff moved the court for compassionate release because his being a wheelchair-bound quadriplegic was a "medical circumstance" that qualified as an "extraordinary and compelling reason" under U.S.S.G. § 1B1.13(b)(1), and the court ordered him released, well short of the minimum. Can a sentencing court really circumvent the statutory minimum at the five (or ten) year mark when it could not do so originally? *Cf. Concepcion v. United States*, 597 U.S. 481, 492 (2022) ("The discretion federal judges hold at initial sentencings also characterizes sentencing modification hearings.").

## VI.

There is one remaining separation of powers concern inherent in the Commission's policy statement. Consider the Commission's peculiar parenthetical exception, which says: "a change in the law (*other than* an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason." § 1B1.13(b)(6) (emphasis added). So, according to the Commission, courts are to consider some nonretroactive changes in the law, but not others. Specifically, a nonretroactive change to a Congressional statute or judicial caselaw can create "an extraordinary and compelling reason" for release, but a nonretroactive change to the Guidelines—no matter how "gross" the disparity—cannot create "an extraordinary and compelling reason" for release.

According to one district court, this jerry-rigged exception makes § 1B1.13(b)(6) an "unprincipled, inconsistent, and unreasonable" interpretation of the statute:

> [T]he Commission . . . has purported to authorize individual judges to apply retroactively laws that Congress has intentionally chosen not to apply retroactively, while carving out nonretroactive changes to the Guidelines. A principled approach would either authorize compassionate release based on all nonretroactive changes in the law, or none at all. It is unprincipled and inconsistent to adopt an approach that allows compassionate release based on some, but not all, nonretroactive changes to the law.

*United States v. Crandall*, No. 89-cr-21, 2024 WL 945328, at \*8 (N.D. Iowa Mar. 5, 2024); *see also id.* at \*10 ("It is not for [the Commission] to use the compassionate release statute, a narrowly-tailored statute designed to provide relief when an offender has identified extraordinary and compelling reasons justifying release from prison, to [have courts] arbitrarily decide whether, under today's standards, the sentence seems unusually long or somehow unfair.").[14]

The Commission's decision in § 1B1.13(b)(6) to give retroactive effect to *some* nonretroactive changes (in statute or case law) *but not others* (in the Guidelines) is not only an unreasonable interpretation or construction of § 3582(c)(1)(A)(i), it amounts to a heavy-handed

---

[14]One court has suggested that § 1B1.13(b)(6) also makes 18 U.S.C. § 3582(c)(1)(A)(ii) superfluous. *United States v. O'Neill*, 735 F. Supp. 3d 994. 1021 (E.D. Wis. 2024) ("Allowing an unusually long sentence to be extraordinary and compelling for all defendants would render this provision superfluous.").

and unseemly power grab by the Commission. *See Loper Bright*, 603 U.S. at 395. After instructing courts to treat as retroactive both acts of Congress and judicial rulings, despite those branches' opting to *not* make their decisions retroactive, § 1B1.13(b)(6) then protects its own authority by prohibiting prisoners from relying on nonretroactive changes to its Guidelines.

McHenry and Orta, relying on § 1B1.13(b)(6), point to sentencing changes effectuated by Congress in the First Step Act, which Congress expressly made nonretroactive, even though other parts of that same statute did the opposite with respect to unrelated criminal penalties. *See, e.g.*, First Step Act of 2018, § 404(b), Pub. L. No. 115-391, 132 Stat. 5194, 5222. In other words, these prisoners use § 1B1.13(b)(6) to accomplish through the Commission what Congress expressly forbid them from doing. In the end, § 1B1.13(b)(6) aggrandizes the Commission's powers at the expense of the judiciary and Congress, an acute concern of separation-of-powers jurisprudence. *See Freytag v. CIR*, 501 U.S. 868, 878 (1991) ("Our separation-of-powers jurisprudence generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch.").

The scope of § 1B1.13(b)(6) underscores the nature of the intrusion. Recall that § 1B1.13(b)(6) says that a nonretroactive change in the law can be an "extraordinary and compelling" reason for release if (1) a prisoner has served at least 10 years (2) of "an unusually long sentence," (3) there is a "gross disparity" between the actual sentence and a hypothetical sentence that would apply under the new law, and (4) the sentencing court has fully considered "the defendant's individualized circumstances." *See* fn. 9, *supra*.

Critically, § 1B1.13(b) says "[e]xtraordinary and compelling reasons exist under any of the following circumstances or a combination thereof." So, a prisoner could establish extraordinary and compelling reasons by satisfying subsection (6) alone, without any other considerations (e.g., age, health, family circumstances). And the subsection (6) factors, or "requirements"—"unusually long," "gross disparity, and "individualized circumstances"—are either in the eye of the beholder or the natural consequence of Congress's choosing to not make the new sentencing statute retroactive. The first two of § 1B1.13(b)(6)'s factors—"at least 10 years" an "unusually long sentence"—are not individual to any one prisoner; they merely parse the overall prison population. Nor are they anything but ordinary—so this is not a situation in

which the cumulative effect of some slightly-more-than-ordinary factors would combine to become extraordinary. Some 55.5% of federal inmates are currently serving a sentence of ten or more years,[15] all of whom will eventually serve the 10 years necessary to satisfy the first and (arguably) second § 1B1.13(b)(6) factors. The net result is that § 1B1.13(b)(6) allows the Commission to moonlight as Congress to reduce the sentences of the majority of federal prisoners.

The Commission's attempt, via the U.S.S.G. § 1B1.13(b)(6) policy statement, to empower courts to give retroactive effect to nonretroactive sentencing amendments and to ignore or overcome statutory mandatory minimum sentences violates the separation of powers. In *Neal*, 516 U.S. at 295-96, the Supreme Court—recognizing "institutional concerns about the relationship of the Judiciary to Congress"—explained that "Congress, not this Court, has the responsibility for revising its statutes. Were we to alter our statutory interpretations from case to case, Congress would have less reason to exercise its responsibility to correct statutes that are thought to be unwise or unfair." Likewise here, were we to enable the Commission to change the meaning and effect of a sentencing statute—and to contravene or negate our precedent and other federal statutes—through the promulgation of a policy statement that ranges unreasonably far from the text of the statute, then Congress would have little incentive to exercise its authority to revisit such statutes.

**VII.**

For the forgoing reasons, we hold that the Sentencing Commission's policy guidance in U.S.S.G. § 1B1.13(b)(6) is invalid. Consequently, we REVERSE *Bricker* and AFFIRM *McHenry* and *Orta*, thereby denying compassionate release for all three prisoners.

---

[15]*QuickFacts: Individuals in the Federal Bureau of Prisons*, U.S. Sentencing Comm'n (Jan. 2024), available at https://www.ussc.gov/research/quick-facts/individuals-federal-bureau-prisons. According to this Commission report, 37.2% of federal inmates are serving a sentence between 10 and 20 years; 15.7% are serving a sentence of 20 years or more; and 2.6% are serving a life sentence. The average sentence is more than 12 years (149 months).

––––––––––––––––––

**DISSENT**

––––––––––––––––––

JANE B. STRANCH, Circuit Judge, dissenting.  The majority opinion misapprehends recent Supreme Court precedent on administrative law, misconstrues this court's opinion in *United States v. McCall*, 56 F.4th 1048 (6th Cir. 2022) (en banc), and ignores the plain language of several statutes to read constraints into a statutory scheme where none exist.  Because these cases and statutes instead support holding that USSG § 1B1.13(b)(6) is a valid and binding exercise of the Commission's delegated authority, I respectfully dissent.

**I.  ANALYSIS**

**A.  The Binding Nature of Sentencing Commission Policy Statements**

I begin with a brief history of the Supreme Court's jurisprudence on deference to agencies, because the majority overlooks this essential component.  The proper method for assessing deference to agency rules in cases where Congress has expressly delegated rulemaking authority to an agency is not new.  It was not new after *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).  And it was not new after *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  In the early nineteenth century, the Supreme Court recognized that, when Congress chooses to expressly delegate interpretive authority, courts should defer to reasonable agency interpretations of a statute.  *Edward's Lessee v. Darby*, 25 U.S. (12 Wheat.) 206, 210 (1827) ("In the construction of a doubtful and ambiguous law, the cotemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect.").

By the late twentieth century there was well established doctrine regarding the appropriate deference in cases of express delegation:

> Congress in [the relevant statute] expressly delegated to the [agency] the power to prescribe standards for determining what [a particular statutory term means].  In a situation of this kind, Congress entrusts to the [agency], rather than to the courts, the primary responsibility for interpreting the statutory term. In exercising that responsibility, the [agency] adopts regulations with legislative effect. *A reviewing*

> *court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner. . . . The regulation at issue in this case is therefore entitled to more than mere deference or weight. It can be set aside only if the [agency] exceeded [its] statutory authority or if the regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."*

*Batterton v. Francis*, 432 U.S. 416, 425-26 (1977) (citations omitted) (emphasis added).

The Supreme Court also specified definitive parameters establishing when a policy statement or other agency decision is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." In *United States v. Labonte*, the Court explained that courts are to look to the specific directives of Congress and to determine whether the policy statement conflicts with those directives. 520 U.S. 751, 757 (1997). In particular, courts look to whether the policy statement is "at odds with [the statute]'s plain language" or "manifestly contrary to the statute." *Id.*; *United States v. O'Hagan*, 521 U.S. 642, 673 (1997). In short, in the express delegation context, our role as courts is to determine what the statute does and does not permit based on its unambiguous plain text, and then to allow the Commission to define the terms Congress has instructed it to, provided that the Commission's definition is not arbitrary, capricious, or contrary to the unambiguous plain text of the statute.

The Supreme Court has provided a template for how to handle cases where a court has construed a statute one way, but an agency to which authority was delegated has construed it another, and the court must now determine whether the regulation is manifestly contrary to the statute. In *AT&T Corp. v. City of Portland*, 216 F.3d 871 (9th Cir. 2000), the Ninth Circuit construed a statute by "look[ing] first to the plain language of the statute," construing the provisions of "the entire law, including its object and policy," and considering the history of regulation of similar policies. *Id.* at 876-78 (citation omitted). The court reached a conclusion and, in doing so, never asserted that the statute's text alone was unambiguous. *Id.* at 880. When the Ninth Circuit was later faced with an agency decision that construed the relevant statute in a manner contrary to *Portland*, it rejected the regulation. *Brand X Internet Servs. v. FCC*, 345 F.3d 1120, 1130-31 (9th Cir. 2003).

The Supreme Court expressly critiqued this approach on grounds that "a court's interpretation of a statute trumps an agency's under the doctrine of *stare decisis* only if the prior court holding 'determined a statute's *clear* meaning.'" *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 984-85 (2005)[1] (quoting *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 131 (1990)). A contrary rule, the Court explained "would produce anomalous results," because the meaning of a statute would turn, not on the law, or the regulations, but on who interpreted the statute first: the court or the agency. *Id.* at 983. "Yet whether Congress has delegated to an agency the authority to interpret a statute does not depend on the order in which the judicial and administrative constructions occur." *Id.* Thus, it is entirely possible for a court to reach a resolution of the issue based on the traditional tools of statutory construction without concluding that the underlying plain text unambiguously forecloses a different resolution. In such cases, an agency to which authority has been expressly delegated may permissibly reach a different resolution.

What role, then, do *Chevron* and its subsequent demise in *Loper Bright* play? The legal rule announced in *Chevron* and eliminated in *Loper Bright* was not a change in either the degree of deference given to agencies, or the degree of statutory ambiguity required for deference to be given. Rather, the *Chevron* rule simply imported the longstanding rules and standards for express delegation into a new kind of delegation: implied delegation. *Chevron*, 467 U.S. at 844. Under *Chevron*, a court did not need to identify an express delegation to an agency before deferring to the agency. *Id.* at 842-43. Because a court could assume that ambiguity in a statute was "implicitly" delegation to an agency, even where Congress had expressed no desire for an agency to construe a statutory term, courts were to defer to reasonable agency construction. *Id.*

---

[1]*Brand X* considered a case of implied delegation through an ambiguous statute. 545 U.S. at 984. It was, therefore, decided under the *Chevron* doctrine. *Id.* At the time, under *Chevron*, courts used the same "manifestly contrary" test that courts now use for interpretations made pursuant to express delegation to evaluate agency interpretations made pursuant to implied delegation. *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 4456-58 (2011) (explaining that the same standards applied to the analysis of an agency interpretation regardless of the type of delegation under *Chevron*). Thus, *Brand* X's holdings were equally applicable to cases of express and applied delegation. After *Chevron's* demise, the deference methodology *Brand X* employed no longer applies to cases of implied delegation; nor does the explication of the role of the agency under the *Brand X* methodology. But *Brand X*'s explication of the role of agency interpretations of statutes vis-à-vis court interpretations remains good law in any case where the deference methodology it employed still applies. As will be discussed below, cases of express delegation fall precisely into that category.

While *Chevron* was on the books, therefore, there was neither a difference in degree nor a difference in kind between the two types of delegation—express and implied. Courts treated situations where Congress had written a slightly ambiguous statute in exactly the same way they treated situations in which Congress had expressly left gaps and directed the agencies to fill them. The Court in *Loper Bright* overturned *Chevron*, holding that "an ambiguity is simply not a delegation of law-interpreting power." *Loper Bright*, 144 S. Ct. at 2265 (quoting Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv. L. Rev. 405, 445 (1989)).

But while *Loper Bright* overruled *Chevron*, and significantly reduced the deference given to agencies in the *implied* delegation context, it did not purport to disturb pre-*Chevron* law for *express* delegation. Indeed, *Loper Bright* cited pre-*Chevron* precedent setting forth the rules for deference in the express delegation context with approval. *Loper Bright*, 144 S. Ct. at 2263. The Court explicitly preserved the role of an agency's interpretation in the express delegation context:

> In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion. Congress has often enacted such statutes. For example, some statutes "expressly delegate" to an agency the authority to give meaning to a particular statutory term. Others empower an agency to prescribe rules to "fill up the details" of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as "appropriate" or "reasonable."

> When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits. The court fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries. By doing so, a court upholds the traditional conception of the judicial function that the APA adopts.

*Id.* (cleaned up). Post *Loper Bright*, there now exists at law an important difference in kind between the express and implied delegation contexts. In the realm of express delegation, agencies are still entitled to significant deference under the same rules in existence since the nineteenth century; in the realm of implied delegation, agencies are no longer so entitled.

This history provides a clear framework for what courts should do, in the express delegation context, when faced with an agency interpretation of a statute that courts have already construed. Ordinarily, there are many tools in a court's statutory interpretation toolbox—text, history, structure, background legal principles, legislative history, purpose, etc. And ordinarily, even where a statute is ambiguous, courts must still resolve the case and give that statute meaning. But in the express delegation context, courts are to use only a single tool: text. And only if the plain text unambiguously forecloses the agency's interpretation may courts disturb that interpretation. When governing case precedent demonstrates that the text alone is unambiguous and precludes the agency's interpretation, that prior precedent is binding, and courts must follow it in rejecting the agency rule. Where, however, prior precedent shows that the text is ambiguous, or resorts to reaching back into the toolbox for other interpretive tools beyond the text, *Brand X* teaches that such precedent cannot control the validity of a later agency construction of that same text. 545 U.S. at 984.

The majority's failure to understand or sometimes even acknowledge this historical framework leads the majority opinion to claim interpretive authority this court simply does not have. The genesis of the majority's error is in its misconstruction of *Loper Bright*. The opinion injudiciously interprets *Loper Bright* as standing for the proposition that "courts no longer defer to agency regulations as the authoritative (binding) interpretation of a statute," even those based on expressly delegated authority. Maj. Op. at 16. But, as discussed above, *Loper Bright* did not disturb the Supreme Court's longstanding precedent requiring courts to defer in the express delegation context; it merely eliminated the implied delegation precedent.

Confusingly, the majority directly quotes the very passage from *Batterton v. Francis,* quoted in full above; but there the Supreme Court explained that courts must defer in the express delegation context because an agency's interpretation of a statute it has been expressly instructed to interpret can be "set aside only if the [agency] exceeded [its] statutory authority or if the regulation is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Maj. Op. at 15. (quoting *Batterton*, 432 U.S. at 425-26). The majority provides no explanation as to why *Batterton* does not apply here or why *Batterton* does not mean what it plainly says.

The majority compounds its initial error by positing that the difference between express and implied delegation is "a difference in degree, not kind" thereby claiming the authority to treat express delegation as diminished post-*Loper Bright* in the same way implied delegation has been.  Maj. Op. at 16-17.  But, once again, as discussed above, the difference between express and implied delegation is not and never has been a difference of degree.  There has never been a time when courts applied the same type of deference in both the express and implied delegation contexts but to a greater or lesser degree.  The question debated by the court in *Chevron* and *Loper Bright* was not about the degree of deference courts must give, but about what statutory circumstances merit deference in the first place.  *Loper Bright* clarified that deference was appropriate in the express context but not the implied context.  144 S. Ct. at 2265.

Turning to the relationship between our past precedent and new constructions by the agencies, the majority classifies any guideline that provides an interpretation of an ambiguous statute that is different from the one promulgated by this court as an attempt to "overrule a Circuit Court's interpretation of a statute."  Maj. Op. at 3, 14.  But this incorrectly presumes what happens when the Commission promulgates a rule interpreting an ambiguous statute that it has been expressly delegated the authority to interpret.  Indeed, the Supreme Court has explicitly rejected the majority's assumption that a court's holding is being "overruled" by such an agency action:

> The dissent answers that allowing an agency to override what a court believes to be the best interpretation of a statute makes "judicial decisions subject to reversal by executive officers."  It does not. . . .  The precedent has not been "reversed" by the agency, any more than a federal court's interpretation of a State's law can be said to have been "reversed" by a state court that adopts a conflicting (yet authoritative) interpretation of state law.

*Brand X*, 545 U.S. at 983-84 (cleaned up).

When an agency adopts a new interpretation of a statute, a new legal landscape is formed in which a court must operate.  Had there been no agency interpretation of the statute, the correct interpretive methodology would be for the court to look to the text, recognize that the text is ambiguous, recognize that the text delegates interpretive authority to the agency, recognize that the agency has not exercised that authority, and then turn to other tools of statutory

interpretation. But, in the express delegation context, once an agency interpretation has been promulgated, the correct interpretive methodology would be for the court to look to the text, recognize that the text is ambiguous, and recognize that the text delegates interpretive authority to the agency, just as before. But this time, when the court looks to the agency, it will find an answer because the agency has exercised its authority, and, thus, the court will proceed no further. The new ruling does not overrule the pre-agency-action ruling or challenge its propriety when it was made; it simply recognizes an intervening change in the facts on the ground—i.e., the presence or absence of an agency rule.

Finally, the majority wrongly pulls a portion of *Loper Bright* out of context, quoting language in which the Supreme Court notes the evils of allowing an agency interpretation of a statute to take precedence over a prior judicial construction. Maj. Op. at 16 (citing *Loper Bright*, 144 S. Ct. at 2265). The majority's argument that any prior construction by this court must reign supreme misunderstands *Loper Bright*. That section of *Loper Bright* addresses the *implied* delegation context in which Congress has not expressly instructed the agency to interpret a particular term; the concern was that courts were abdicating their authority by allowing the agency determination to prevail. *Loper Bright*, 144 S. Ct. at 2265. In the express delegation context, there is no abdication of authority when courts acknowledge that Congress expressly instructed the agency to define the terms of the statute and interpretation of the statute by the courts must hinge on the agency's definitions. *Id.* at 2263.

In this dissent, I will follow binding Supreme Court precedent on deference, recognizing and giving effect to Congress's delegation to the agency as commanded by *Loper Bright*, rather than circumventing Congress's delegation decision as does the majority opinion. 144 S. Ct. at 2263. In the statute at issue in this case, we have a clear case of express delegation—18 U.S.C. § 3582(c)(1)(A) provides that a court may reduce a term of imprisonment after considering the sentencing factors set forth in 18 U.S.C. § 3553(a) where "extraordinary and compelling reasons warrant such a reduction." In 28 U.S.C. § 994(a)(2)(C), Congress delegated to the Sentencing Commission the authority to make general policy statements regarding the application of 18 U.S.C. § 3582(c). Congress expressly directed in 28 U.S.C. § 994(t) that the Commission should, "in promulgating general policy statements regarding the sentencing modification

provisions in section 3582(c)(1)(A) of title 18, . . . describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."

Further, in 18 U.S.C. § 3582 itself, Congress instructed that courts should make their findings "consistent with applicable policy statements issued by the Sentencing Commission." This language "expressly cabin[s] district courts' discretion by requiring courts to abide by the Sentencing Commission's policy statements." *Concepcion v. United States*, 597 U.S. 481, 495 (2022) (interpreting identical language in 18 U.S.C. § 3582(c)(2)). It requires courts to "follow the Commission's instructions . . . to determine the prisoner's eligibility for a sentence modification." *Dillion v. United States*, 560 U.S. 817, 827 (2010). Indeed, this court has held that, "regardless of whether Congress wanted policy statements to be binding in the sentencing context, it wished them to be binding in § 3582(c) proceedings. If a sentence reduction is inconsistent with a policy statement, it would violate § 3582(c)'s directive, so policy statements must be binding." *United States v. Horn,* 679 F.3d 397, 402 (6th Cir. 2012) (quoting *United States v. Garcia*, 655 F.3d 426, 435 (5th Cir. 2011)). Because Congress expressly delegated authority to interpret the words "extraordinary and compelling reasons" to the Commission, courts must defer to the Commission unless the Commission's policy statement is arbitrary, capricious, or contrary to the plain meaning of the statute. *Batterton*, 432 U.S. at 425-26.

The Commission, in USSG § 1B1.13(b)(6), provided that a narrow class of nonretroactive changes in law can factor into the extraordinary and compelling analysis:

> If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

USSG § 1B1.13(b)(6). No party contends that USSG § 1B1.13(b)(6) is arbitrary and capricious. The question, then, is whether USSG § 1B1.13(b)(6) is contrary to the plain language of the statute.

**B. The Role of the *McCall* Opinion**

Both the government and the majority argue that our plain language inquiry can be resolved simply by looking to this court's decision in *United States v. McCall*, in which we held that "[n]onretroactive legal developments do not factor into the extraordinary and compelling analysis." Maj. Op. at 12-13 (citing 56 F.4th 1048, 1066 (6th Cir. 2022)). Governing caselaw rejects that claim. Recall that, in the express delegation context, where the agency is the primary interpreter of the text, an agency interpretation may be binding even in the face of a prior judicial decision that interpreted the meaning of the statute but could only do so based on tools beyond the text. *Brand X*, 545 U.S. 967, 984 (2005).

Before the Commission's statement in USSG § 1B1.13(b)(6), this court, like the Ninth Circuit in *Portland*, was required to interpret a statute without an existing agency interpretation. The *McCall* court recognized that the statute did delegate interpretive power to the agency, but it also recognized that the agency had not yet exercised its authority. *McCall*, 56 F.4th at 1054. As a result, the court interpreted the statute using other tools of statutory interpretation. *Id.* at 1055-61. As in *Brand X*, the landscape is now different because there is an agency interpretation. Provided that that agency interpretation is not contrary to the text of the statute, the role of this court now is to give effect to Congress's delegation of interpretive authority to the Commission regardless of any prior interpretation in *McCall*. Therefore, *McCall* only binds this court if it held that the *plain text* of the statute unambiguously foreclosed a contrary reading. *McCall* expressly did not.

*McCall* begins with an entire section on how vague "extraordinary and compelling" is as a standard. The opinion looks to the text, but concludes that it is unhelpful:

> Our analysis starts, as it must, with the text of the compassionate-release statute. With no statutory definition of "extraordinary and compelling reasons" to guide us, we interpret the phrase "in accord with the ordinary public meaning of its terms at the time of its enactment[.]" And to do so, we rewind the clock to the time of the Sentencing Reform Act's adoption, here 1984. At that time, most understood "extraordinary" to mean "most unusual," "far from common," and "having little or no precedent." "Compelling," for its part, referred to "forcing, impelling, driving."

> At first glance, these common-sense definitions only seem to reiterate what we already know. Of course, an "extraordinary and compelling reason" is one that is unusual, rare, and forceful. But in a vacuum, the phrase "extraordinary and compelling" does little to illuminate the specific type of unique or rare reason that might justify relief. This leads us back to the question with which we began. Does a district court's discretion to define "extraordinary and compelling" encompass any reason—legal or factual—it finds convincing?

*McCall*, 56 F.4th at 1055 (internal citations omitted) (emphasis added).

To resolve the matter, the opinion then delves into a lengthy discussion of "background principles of federal sentencing law," congressional intent as revealed by the structure of the rest of the statute, the role of the compassionate release provision in the statute in relation to other resentencing statutes, and the history of compassionate release. *Id.* at 1055-60. By this circuit's principles of statutory interpretation, the discussion of these extra-textual factors would have been irrelevant and unnecessary if the text was unambiguous on its face. Governing principle teaches that background principles, structure, and history are irrelevant where the text itself is clear. For example, in *United States v. Asgari*, we rejected an argument based on background principles explicitly because such principles were not needed where the statute's text was clear. 940 F.3d 188, 190 (6th Cir. 2019). Likewise in *United States v. Ninety-Three Firearms*, we noted that we were turning to the structure of a statute only because the text was ambiguous. 330 F.3d 414, 421 (6th Cir. 2003). And, in *NLRB v. SW Gen., Inc.*, the Supreme Court held that it need not look at historical evidence because "the text is clear, so we need not consider this extra-textual evidence." 580 U.S. 288, 305 (2017). Thus, *McCall*'s resort to background principles, structure, and history is an admission that the text is ambiguous. Opinions that must reach for other tools beyond the text from the statutory interpretation toolbox do not provide the kind of unambiguous plain text conclusion necessary to undermine a contrary agency interpretation. The clear holding of *McCall*, then, is that the text of the statute is ambiguous on its face but is subject to construction using various tools of statutory interpretation, just as the text in *Portland* was.

The majority resists this conclusion by overlooking *McCall*'s clear statement that the text alone is unclear in favor of a few cherry-picked quotations from *McCall* which, the majority asserts, constitute a holding that the text is unambiguous. Maj. Op. at 17 n.13.**[2]** But, in context, none of these quotations assert what the majority opinion claims they do. The opinion begins with *McCall*'s assertion that "there is no such ambiguity here." Maj. Op. at 17 n.13 (quoting *McCall*, 56 F.4th at 1064). That phrase is drawn from this court's rejection of *McCall*'s appeal to legislative history:

> [L]egislative history is not the law. And even when courts consider legislative history, they do so only when it sheds a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms. There is no such ambiguity here. The text of the compassionate-release statute, informed by the principles, history, and structure of sentencing law forecloses McCall's argument.

*McCall*, 56 F.4th at 1064 (cleaned up). The *McCall* court did not conclude that the text of the statute was unambiguous on its face. Rather, the court concluded that the text was not ambiguous after consideration of both text and other tools like "principles, history, and structure," all of which rendered resort to such a disfavored tool as legislative history unnecessary. That conclusion was useful in the context of *McCall*, but, as discussed above, it is not relevant to the question of whether the agency may adopt a contrary conclusion, because it does not rest solely on unambiguous plain text.

The majority similarity quotes *McCall*'s claims that "[f]ramed against this background, the text of the compassionate-release statute gives way to a basic inference: What is 'ordinary' and routine cannot also be extraordinary and compelling" and "[v]iewed in this light, the phrase 'extraordinary and compelling reasons' comes into sharper focus." Maj. Op. at 17 n.13 (citing *McCall*, 56 F.4th 1055-56). But the participial phrases at the beginning of these sentences are important. The "background" against which the text was framed and the "light" in which it was viewed both integrally involved the "principles, history, and structure" of the text. *McCall*, 56 F.4th 1055-56. Once again, neither of these sentences was a claim that the text was unambiguous on its face, but, rather, that it could be construed "against the background" and "in

---

**[2]**The majority provides no analysis as to why this court would assert that the text was unclear on its face, resort to tools of statutory construction reserved for situations in which the text is unclear, and then reach the internally inconsistent holding that the text was unambiguous.

the light of" other tools of statutory construction.  Neither is, therefore, relevant to the purely textual inquiry we must undertake today.

Finally, the majority quotes *McCall*'s assertion that "we cannot reconcile this approach with the plain text of the compassionate-release statute."  Maj. Op. at 17 n.13 (citing *McCall*, 56 F.4th 1065).  True, this sentence references the plain text of the statute.  The problem is that the "approach" *McCall* rejected was an interpretive approach that viewed the compassionate release statute as holding the goal of "alleviating unfair and unnecessary sentences as judged by today's sentencing laws."  *McCall*, 56 F.4th 1065 (citation omitted).  Thus, we are bound by *stare decisis* to reject that interpretive approach.  But it is entirely consistent to hold both (1) that the statute is ambiguous as to whether nonretroactive changes may be considered as part of the analysis and (2) that the goal of the statute was not to "alleviat[e] unfair and unnecessary sentences as judged by today's sentencing laws." *Id.* (citation omitted).

By way of analogy, Congress expressly prohibited courts from finding that rehabilitation, alone, was an "extraordinary and compelling reason."  28 U.S.C. § 994(t).  It would be contrary to the plain text of the statute, therefore, to approach the statute by assuming that Congress's purpose was to ensure that prisoners who have achieved sufficient rehabilitation are released.  But even though Congress did not write the statute with the purpose of ensuring that prisoners who have been rehabilitated are released, courts routinely (and permissibly) consider rehabilitation in the "extraordinary and compelling" analysis.  *See, e.g.*, *United States v. Peoples*, 41 F.4th 837, 842 (7th Cir. 2022); *United States v. Brooker*, 976 F.3d 228, 237-38 (2d Cir. 2020).  Thus, the rejection of the approach described by the court in *McCall* does not rule out the Commission's reading of the statute.

Despite the majority's attempts to stretch the *McCall* opinion to cover the question we must resolve today, our precedent leaves open both the question of whether the Sentencing Commission has the authority to issue a policy statement allowing courts to consider nonretroactive changes in law as an "extraordinary and compelling reason" and the underlying question of whether the text of § 3582(c) permits such an interpretation.  We must, therefore, review those questions without the benefit of clear precedent from the en banc court.

**C. The Reasonability of USSG § 1B1.13(b)(6)**

I turn now to the appropriate analysis: de novo interpretation of the statute to determine whether it unambiguously forecloses the reading put forward by USSG § 1B1.13(b)(6). I begin with the statute's text and then address several broader, textual arguments made by the majority.

1. <u>The Text of § 3582(c)</u>

It is established precedent in this circuit that the terms "extraordinary and compelling" are, at least to some extent, ambiguous. As discussed above, *McCall* made a point of how unclear they were. *McCall*, 56 F.4th at 1055. Our pre-*McCall* precedent says the same. *United States v. Hunter*, 12 F.4th 555, 566 (6th Cir. 2021) (calling the phrase "vague and amorphous"). And there is evidence that the statute is ambiguous on precisely this point. Our circuit has found that judicial disagreement is evidence of ambiguity, *Valent v. Comm'r of Soc. Sec.*, 918 F.3d 516, 521 (6th Cir. 2019); *N. Fork Coal Corp. v. Fed. Mine Safety & Health Rev. Comm'n*, 691 F.3d 735, 740 (6th Cir. 2012), as has the Supreme Court, *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 739 (1996). Prior to the Commission's adoption of USSG § 1B1.13(b)(6), there was a deep circuit split on whether "extraordinary and compelling reasons" could encompass nonretroactive changes in law and, if so, which ones. *Compare United States v. Ruvalcaba*, 26 F.4th 14, 28 (1st Cir. 2022) (holding that, on the face of the statute, nonretroactive changes could be "extraordinary and compelling"), *United States v. McCoy*, 981 F.3d 271, 286 (4th Cir. 2020) (same), *United States v. Chen*, 48 F.4th 1092, 1098 (9th Cir. 2022) (same), *and United States v. McGee*, 992 F.3d 1035, 1047 (10th Cir. 2021) (same), *with United States v. Andrews*, 12 F.4th 255, 260-62 (3d Cir. 2021) (holding that, on the face of the statute, nonretroactive changes could not be "extraordinary and compelling"); *United States v. Thacker*, 4 F.4th 569, 573-75 (7th Cir. 2021) (same), *United States v. Crandall*, 25 F.4th 582, 585-86 (8th Cir. 2022) (same), *and United States v. Jenkins*, 50 F.4th 1185, 1198 (D.C. Cir. 2022) (same). This suggests that the statute is not merely ambiguous generally, but ambiguous specifically as to whether nonretroactive changes in law can factor into a court's analysis of "extraordinary and compelling reasons." The ambiguity on this point suggests that a reading permitting the consideration of nonretroactive changes in law would not be "manifestly contrary" to the plain text of the statute.

Viewing the text from first principles shows the impropriety of concluding that USSG § 1B1.13(b)(6) is manifestly contrary to the text of the statute. Section 3582, itself, provides very few limits. 28 U.S.C. § 994(t) prohibits the Commission from guiding courts to consider rehabilitation alone. This policy guideline does not violate that provision. As the court in *McCall* noted, the text of § 3582(c)(1)(A) provides an additional limit in that the reasons must be genuinely extraordinary and compelling. *McCall*, 56 F.4th at 1063. It would, therefore, be contrary to the plain text of the statute (as well as extremely unhelpful) for the Commission to define "extraordinary and compelling reasons" to mean any reasons whatsoever that reflect well upon the defendant except for rehabilitation. But beyond such obviously non-extraordinary constructions, even the court in *McCall* noted that "the phrase 'extraordinary and compelling' does little to illuminate the specific type of unique or rare reason that might justify relief." *Id.* at 1055 (emphasis removed).

It is not unreasonable to conclude that a prisoner meeting the qualifications required by USSG §1B1.13(b)(6) faces conditions that are extraordinary and compelling. To be sure, changes in law are not extraordinary. But USSG §1B1.13(b)(6) requires more than a change in law. It requires a change in law, that the change in law be so substantial as to create a "gross disparity" between the sentence the defendant would have received under the new law and the one he received at his initial sentencing, that the defendant received an unusually long sentence in the first place, and that he has already served ten years of that sentence. The ten-year requirement alone restricts those eligible to a small fraction of the prison population. Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254, 28259 (May 3, 2023). Restricting release to those with unusually long sentences who have suffered the unfairness of a sentence no longer deemed acceptable by Congress places those eligible under USSG § 1B1.13(b)(6) in a rare group of prisoners who have been subject to unusual conditions that set them apart both numerically and morally from their fellow prisoners.

Just as it is ordinary to become sick, but it is extraordinary to become so ill as to satisfy USSG § 1B1.13(b)(1)—the provision for compassionate release in the case of severe illness—it is ordinary to have been sentenced under a law that subsequently changed, but it is not unreasonable to conclude that it is extraordinary to be so affected by such a change as to satisfy

USSG § 1B1.13(b)(6). In the face of a policy statement that designates a narrow category of offenders who, at least arguably, are highly unusual and unfairly situated, the text of the statute does little to contradict the Commission's guidance.

### 2. Reasonability in Light of Nonretroactivity

The majority argues that, even if the text of the compassionate release statute itself does not prohibit USSG § 1B1.13(b)(6), the text of the United States Code as a whole does. Maj. Op. at 19. In the majority's view USSG § 1B1.13(b)(6) "effectively giv[es] retroactive effect to [] nonretroactive change[s] to sentencing law," in violation of 1 U.S.C. § 109, which provides that "[t]he repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide." Maj. Op. at 21-22 (quoting 1 U.S.C. § 109). The majority makes a similar argument in its assertion that the Sentencing Commission has violated the separation of powers by attempting to override Congress's decisions about which changes in law should be retroactive.

Both of these arguments elide a key distinction between § 1B1.13(b)(6) and the kind of blanket retroactivity prohibited by 1 U.S.C. § 109. USSG § 1B1.13(b)(6) does not propose a system in which defendants may automatically be resentenced upon the change in law as though their sentences were no longer valid. This is apparent for several reasons. First, USSG § 1B1.13(b)(6) requires defendants to have been in prison for ten years, regardless of whether they would receive a sentence of ten years now. In doing so, it inherently accepts the validity of the longer original sentence (otherwise it would be a due process violation to hold the prisoner for the ten years), but requests resentencing based on new circumstances.

Second, a court granting compassionate release under USSG § 1B1.13(b)(6) is not bound by the new statutory maximum punishments (although the court is bound by the old statutory maximums). A court in such circumstances could reduce a defendant's sentence to one lower than the one they originally received but higher than the statutory maximum under the new law. If the changes in law were truly retroactive, such an above maximum sentence would be impossible. Fundamentally, while USSG § 1B1.13(b)(6) allows consideration of new law, it does not impose the new law upon the court in the way retroactivity would. Thus, it does not run

afoul of 1 U.S.C. § 109 and it does not create a separation of powers problem by circumventing Congress's nonretroactivity decisions.

### 3.  Reasonability in Light of Mandatory Minimums

The majority next suggests, although it declines to decide, that USSG § 1B1.13(b)(6) may be contrary to existing law because it empowers a court to resentence a defendant below the statutory minimum in effect at his original sentencing.  Maj. Op. at 24-27.  This argument fails because this circuit has already held that courts may consider nonretroactive changes in sentencing law when considering the extent of a sentence reduction.  *McCall*, 56 F.4th at 1066 n.8.

If a defendant presented other extraordinary and compelling reasons (e.g., age and illness), he could be resentenced with consideration of the new statutory minimums rather than the old ones even under *McCall*.  *Id.*  The proposition that a defendant, originally sentenced with the old minimum, would have his sentence reduced to one appropriate under the new scheme cannot, therefore, itself, be problematic.  *See United States v. Thanker*, 4 F.4th 569, 574 (7th Cir. 2021) ("In making this observation, we are not saying that extraordinary and compelling individual circumstances, such as a terminal illness, cannot in particular cases supply the basis for a discretionary sentencing reduction of a mandatory minimum sentence.").  Given that our law already contemplates the use of compassionate release to resentence a defendant below the mandatory minimum, allowing specific types of circumstances to qualify as "extraordinary and compelling reasons" for that compassionate release does not make resentencing below the old minimum any more problematic.

## II.  CONCLUSION

Nothing in 18 U.S.C. § 3582(c)(1)—or any other provision of the code—makes clear by unambiguous plain text that nonretroactive changes in law can never be "extraordinary and compelling" reasons for resentencing.  Though a fair reading of § 3582(c)(1) could exclude changes in law, as this court held in *McCall*, that is not the only permissible reading of the text.  Our decision is bound by governing precedent explicating the role of courts when Congress chooses to employ express delegation.  Because the text is ambiguous and Congress has

expressly delegated to the Sentencing Commission the power to interpret the term "extraordinary and compelling," I would hold that USSG § 1B1.13(b)(6) is a valid and binding exercise of the Commission's delegated authority.  I, therefore, respectfully dissent.